## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARC RIGEL, | : | |
|      **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:03-CV-971** |
| v. | : | |
| | : | **(Chief Judge Kane)** |
| | : | |
| CLIFTON D. WILKS, Individually and | : | |
| as Labor Relations Specialist for the | : | |
| United States Postal Service; | : | |
| JONATHAN LISTER, Individually and | : | |
| as Labor Relations Specialist for the | : | |
| United States Postal Service; | : | |
| BARBARA J. NICKA, Individually and | : | |
| as Acting Manager of Attendance | : | |
| Control and Family Medical Leave | : | |
| Administrator for the United States | : | |
| Postal Service; KATHLEEN | : | |
| MCDERMOTT, Individually and as | : | |
| Human Resource Specialist for the | : | |
| United States Postal Service; JOHN E. | : | |
| POTTER, Postmaster General of the | : | |
| United States Postal Service; and the | : | |
| UNITED STATES POSTAL SERVICE; | : | |
|      **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants' motion for summary judgment.  (Doc. No. 45.)  The

motion has been fully briefed and is ripe for disposition.  For the reasons discussed below, the

motion will be granted, and Plaintiff's FMLA claim will be dismissed.

## I.    BACKGROUND

### A.    Procedural history

Plaintiff Marc Carroll Rigel commenced this civil action on June 11, 2003, against the

United States Postal Service ("USPS" or "Postal Service"), the Postmaster General in his official

capacity and several supervisory employees.  (Doc. No. 1.)  Rigel's complaint indicates that he

seeks relief under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 (2005)

("FMLA"), the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2005) ("FLSA"), and "relief

for the denial of his Constitutional rights."  (Id. ¶¶ 43-50.)  Among other things, Rigel claims

that he was subjected to retaliation "for his successful use and participation in union activities,

including the grievance process." (Id. ¶¶ 29-30.)

On March 15, 2004, Defendants moved for partial judgment on the pleadings.  (Doc. No.

11.)  The Court's March 31, 2005, Order granted Defendants' motion in part, in so far as Rigel's

claims against Defendants Clifton Wilks, Jonathon Lister, and Barbara Nicka were dismissed

without prejudice for failure to serve, and his FLSA and First Amendment retaliation claims

were dismissed.  (Doc. No. 22.)  Thus, Rigel's only surviving claim is that remaining Defendants

USPS, the Postmaster General, and Ms. Kathleen McDermott, named in her individual and

official capacity as a USPS Human Resource Specialist, have willfully "violated Mr. Rigel's

right to have access to and receive protected leave under the FMLA."  (Doc. No. 1, ¶¶ 45, 51(b).)

On April 21, 2006, Defendants filed the instant motion for summary judgment on Rigel's

FMLA claim together with a three-volume record.  (Doc. No. 45.)  On May 31, 2006 Rigel filed

a brief in opposition to summary judgment with exhibits (Doc. No. 31), to which Defendants

filed a timely reply (Doc. No. 63).

When they filed their motion for summary judgment, Defendants also submitted their

Statement of Material Facts in Support of Motion for Summary Judgment ("Statement").  (Doc.

No. 49.)  Rigel filed a response to Defendants' Statement, addressing the facts set forth by

Defendants and also adding 45 paragraphs of additional facts.  (Doc. No. 62.)  With the Court's

leave (Doc. Nos. 66 & 67), Defendants filed a reply to Rigel's response statement of material

facts, in which they argue that Rigel "has essentially admitted" the statements of material facts or

that the Court should deem them to have been admitted.[1]  (Doc. No. 68.)

---

[1]  Specifically, Defendants argue that Rigel employed the following inappropriate tactics:
(1) admitting the statements "by using slightly different wording and/or adding a comment";
(2) admitting the statement, in whole or in part, but then trying "to distinguish, minimize, or alter
the content of the [statement] by making additional assertions based on speculation or without
citing to any evidence to support it"; (3) denying the statement "even though the statement came
directly from the applicable deposition of document and/or plaintiff offered nothing to establish
the statement [was] false"; and (4) denying the statement on the ground that the declarant's
credibility was in issue.  (Doc. No. 68, at 2-3, 6-7.)

    As to Rigel's objections based on a party's credibility, the Court notes that Federal Rule
of Civil Procedure 56 specifically authorizes the granting of summary judgment based on
affidavits and deposition testimony, see Fed. R. Civ. P. 56(c) & (e), and that the Supreme Court
has rejected the argument that summary judgment cannot be granted because a witness's
credibility is at issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  This is
different from the Pennsylvania approach to summary judgment, which holds that summary
judgment cannot be granted to a party when credibility is at issue.  See Penn Center House, Inc.
v. Hoffman, 553 A.2d 900, 903 (Pa. 1989); Nanty-Glo Borough v. American Sur. Co., 163 A.2d
523, 524 (Pa. 1932).

    Defendants' other concerns with respect to Rigel's response to their Statement are not
unwarranted.  Rigel routinely admitted or admitted "in part" the facts offered in the Statement,
but with slightly different wording or with additional commentary elaborating on or
contextualizing the statement offered by Defendants.  On other occasions, Rigel failed to cite
support for his commentary or his denials of Defendants' stated facts.

    The Court has engaged in an independent review of the record.  In some instances, Rigel
denied in whole or in part a particular material fact offered by Defendant and supported the
denial with citation to the record.  The Court has not relied upon alleged facts to which Rigel
made properly supported objections.  However, where Rigel offered mere argument or no
evidence in support of his denial of a fact alleged in Defendants' properly supported statement,
the Court has accepted the fact as true.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)
(nonmoving party may not rest on allegations in the complaint but must "go beyond the
pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and
admissions on file, designate specific facts showing that there is a genuine issue for trial"); see
also L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall
include references to the parts of the record that support the statements.").

### A.      Factual background[2]

*General information*

Plaintiff Marc Carroll Rigel began working for the USPS in 1984, and as of June 2000,

he held the position of window clerk in the Federal Square Post Office in Harrisburg,

Pennsylvania.  Rigel's supervisor at that time, and since 1998, was James Heckler.

The working relationship between Heckler and Rigel was not the best – Rigel once

described it as being "very contentious."  (R. 38, Rigel Dep. 146.)  Prior to the series of events at

issue here, Heckler had issued a notice of removal of Rigel on August 18, 1998, on charges of

improper manipulation of postal accounts and failure to follow instructions.  Rigel grieved his

removal through his union, and an arbitrator concluded that Rigel had, in fact, violated USPS

regulations, but reduced the removal to a 60-day suspension without pay because the initial

phase of the disciplinary procedure had not been properly administered.  Rigel returned to work

after the arbitration at the end of October 1999.

About five months after returning, in early March 2000, Rigel's life partner unexpectedly

became gravely ill, was admitted to the hospital, and told he had few days to live.  Because of

the seriousness of the situation, Rigel took time off from work starting March 1, 2000.  Rigel's

---

[2]  The background information is primarily drawn from Defendants' Statement of
Material Facts, not including those facts to which Rigel properly objected.  See supra footnote 1;
(Doc. No. 49).  The Court has also presented properly supported statements from Plaintiff's reply
statement of material facts.  (Doc. No. 62.)  The Court has presented the facts in the light most
favorable to Plaintiff, the nonmoving party, and has drawn all reasonable inferences in his favor.

The three-volume record for summary judgment can be found as exhibits 3 through 5 to
Docket Number 45, Defendants' motion for summary judgment.  References to the record will
be noted in the text as "R." followed by the page number, using the pagination supplied on the
record itself without respect to the pagination of the individual volumes.

partner passed away on March 5, 2000, and Rigel remained on leave through March 22, 2000. The reasons for leave noted on the March leave slips were annual leave, emergency leave, death in family, bereavement leave, and prescheduled leave.  All these leave requests were approved.

Rigel returned to work at the Federal Square Post Office in late March 2000.

### Rigel's April 14, 2000, request for leave

At 3:15 a.m. on April 14, 2000, Rigel telephoned the attendance control office[3] and requested sick leave for an undetermined period.  He did not detail the reasons for calling off sick, which, according to Rigel, was the typical employee practice at the time.  An attendance control supervisor completed a leave form, which stated that Rigel had taken regular sick leave on April 14, 2000, and did not indicate that Rigel sought or intended to seek FMLA leave. Heckler knew of Rigel's April 14, 2000, sick leave request, having received either a copy of or notice of that day's sick leave slip.

After the April 14, 2000, call, Rigel did not call in again about needing sick leave.  At the time he had called off, Rigel had a significant block of sick and annual leave available.  As a long time postal employee, Rigel also was eligible for extended periods of leave without pay (LWOP) for extended illnesses.[4]

---

[3] At that time, a centralized attendance control office processed the requests for leave for employees in the Harrisburg area, and then attendance control personnel would notify the employee's supervisor of the leave request.

[4] LWOP is an authorized absence from duty in a non-pay status.  (Doc. No. 61-2, App. at 64.)  Except as provided in a collective bargaining agreement or in the Employee Labor and Relations Manual ("ELM") 15.1, granting LWOP is a matter of administrative discretion, calling for a consideration of the needs of the employee, the needs of the Postal Service, and the cost to the Postal Service.  (Id.)  A request for LWOP due to personal illness or injury will not be approved until the USPS receives appropriate documentation from the employee's attending physician.  (Id. at 66.)

**Heckler's April 24, 2000, absence inquiry letter**

As of April 24, 2000, Rigel had neither returned to work nor called attendance control to indicate the reason for his continued absence.  On April 24, 2000, Heckler sent Rigel a standard "absence inquiry" letter by certified mail.  The letter was sent to the official address Rigel provided to the USPS, a post office box which was under Rigel's mother's name and which Rigel's entire family used for the delivery of their mail.  Rigel had used the post office box for years for the delivery of his mail, including any official correspondence from the USPS.  Because of his severe depression, Rigel did not check his mail in April or May 2000; however, under normal circumstances, he would typically retrieve his mail in one of two ways: (1) he would periodically (but not on a daily basis) remove his mail from the post office box; or (2) his mother would remove all mail from the box and call Rigel to have him pick up his mail at her house.

Heckler's absence inquiry letter provided, in relevant part:

> This letter is to instruct you to return to duty on the next regularly scheduled reporting day following your receipt of this letter, with proper documentation to substantiate the entire period of your absence.  If you are unable to report for duty at that time you are REQUIRED to SUBMIT to your SUPERVISOR adequate documentation for your absence.  This documentation MUST show the reason(s) you were unable to report during the ENTIRE period of your absence, and the date you expect to return to duty.  This documentation must be submitted on, or before, 5/1/00.

> If your absence has been due to illness or injury, you MUST furnish satisfactory evidence of your incapacitation.  This evidence MUST show that you were incapacitated, by this illness or injury, for the performance of your duties during the ENTIRE period of you absence, the nature of your illness or injury, the dates on which you visited your doctor and the date you expect to return to duty.  The information relating to your illness or injury must be obtained from the doctor treating you and must be signed by that doctor.  This must

6

> also be submitted to your supervisor on, or before, 5/1/00.
>
> Should you fail to follow these instructions you request for leave will be disapproved for your failure to provide acceptable documentation to support your absence from duty.  You will then be placed in an absence without leave / permission (AWOL) status for the entire period of your absence and steps will be taken to remove you from the Postal Service.
>
> I am enclosing paperwork for FMLA if this would be a covered condition of FMLA.

(R. 53) (capitalization for emphasis in original).  With the letter Heckler included a publication explaining FMLA leave and a Form WH-380, which is an optional form prepared by the Department of Labor that can be used to provide an employer with the information needed to consider an FMLA request.  It must be completed and signed by a qualified health care provider.

On April 26, 2000, Rigel's mother signed for and picked up the April 24, 2000, certified letter.  Rigel's mother called and left a message for Rigel on his answering machine stating that she had a letter from the Postal Service for him.

As of May 10, 2000, Heckler had not received any response from Rigel regarding the April 24, 2000, letter.  (In fact, Rigel had not yet retrieved the letter from his mother's house.) On that date, Heckler changed Rigel's leave for his absence beginning on April 14, 2000, from sick leave to absent without leave or permission (AWOL).

***Heckler's May 5, 2000, pre-disciplinary interview letter***

On May 5, 2000, Heckler sent Rigel a second letter to his official address informing Rigel that he wanted have an interview before initiating administrative action.  The letter stated:

> This letter is to inform you that I wish to interview you prior to the initiation of administrative action.  It is in your best interest that you answer this letter on of before May 12, 2000 . . . If you do not answer this letter in the time allotted, you give me no other choice but to

proceed in the administrative process.

(R. 61.)  On May 12, 2000, Rigel's mother signed for the letter.

During the period of Rigel's continued absence, Heckler did not call Rigel at home because Heckler's personal policy was not to call persons on sick leave, only to write to them. Moreover, according to Rigel, by union rules, once an employee calls and provides the information that is requested by the Postal Service, further contact with the employee is to be made through the union.  Management was not permitted to call the employee directly.

At no time in April or May 2000 did Rigel call Heckler to advise him why he was absent, that he was suffering from depression, or that he was under a doctor's care.  Rigel indicated that this was consistent with the union policy that "[n]o floor line supervisor has the right to know an employee's condition.  That condition is revealed to the FMLA coordinator and/or to the union." (R. 21, 23, Rigel Dep. 78-81, 92-93.)

### *Rigel's situation and initial communication with USPS*

Sometime around April 14-16, 2000, Rigel called and spoke with a union representative, Deb Kyle, explaining that he was unable to work and had called in sick and asking her to "take care of this."  Any action taken by Kyle is unclear from the record.

During the period of his absence, Rigel sunk into a deep depression.  From the time he called off until May 13 or 14, 2000, Rigel did not get out of bed, leave the house, or generally function.  He lost a significant amount of weight and had no contact with family or friends. Rigel was aware that various persons called him and left him messages during this time, but it was not until about May 11th or 12th, when family members and friends indicated that they would enter his home to check on him, that Rigel finally played all the messages on the machine

and began to return phone calls.  At this time, he was still severely depressed.

On May 14, 2000, Rigel retrieved his mail from his mother at her house, including the two certified letters that Heckler had sent on April 24th and May 5th.  In response to these letters, Rigel sent Heckler a brief letter dated May 16, 2000, in which he stated: "I recieved your certified letter dated May 5, 2000, on May 14th.  I will have FMLA documentation to Ms. Barbara J. Nicka sometime between May 16th and May 18th."  (R. 64.)  Heckler received the letter the following day.  Other than sending this letter, Rigel made no contact with Heckler.

Nicka, as FMLA Coordinator for the Harrisburg region of the USPS, was responsible for receiving, processing, and granting or denying an employee's request to have leave classified as FMLA-approved leave.  Nicka did not receive any paperwork concerning Rigel's FMLA request between May 16th and 18th.  In late May, Rigel called her to say that he would be requesting FMLA leave and sending her the appropriate paperwork.  Nicka relayed this information to Heckler, who indicated that it was his understanding that a verbal request for FMLA should be made at the time the employee called off sick.

In late May 2000, Heckler asked Nicka whether she had received any FMLA paperwork regarding Rigel.  She informed him that she had not.

### Heckler's May 30, 2000, notice of removal letter

Heckler decided to initiate a letter of removal, and on May 25, 2000, he drafted a "request for corrective action," requesting to remove Rigel for his failure to (1) report to duty, (2) provide acceptable documentation for his absences, and (3) comply with the instructions in Heckler's April 24 and May 5, 2000, letters.  (R. 64a.)  The request noted that Rigel had stated that the FMLA would be submitted to Nicka between May 16th and May 18th, but that to date

no paperwork had been submitted to him, Nicka, or the medical unit to substantiate the

continued absence.  (R. 64c.)  The Postmaster signed the letter, indicating his concurrence with

Heckler's recommendation.  (R. 64b.)

On May 30, 2000, Heckler sent Rigel a notice of removal by certified mail.  The notice

informed Rigel that, effective July 8, 2000, he was to be removed from the USPS for "failure to

meet the availability/dependability requirements of [his] position."  (R. 65.)  In the letter,

Heckler reiterated the factual background concerning Rigel's initial leave request on April 14,

the absence inquiry and pre-disciplinary request from Heckler, Rigel's failure to respond to the

same, and Rigel's failure to provide the USPS with the FMLA paperwork that he claimed would

be submitted by May 18, 2000.  (Id.)  The letter explained that Rigel was therefore considered

AWOL from April 14, 2000, to date.  The letter stated that if Rigel chose to appeal the notice of

removal, he would "remain on the rolls, but in a non-duty, non-pay status after the effective date

of this action, until disposition of your case has been reached . . ."  (R. 66.)  The letter also

explained the calculation of an employee's back pay period and what efforts were expected from

an employee to mitigate his losses while appealing the removal.  (Id.)

At the time of sending the removal letter, the USPS had not received any FMLA

documentation from Rigel.  Heckler testified at his deposition that he had not been informed

about and was unaware of Rigel's depressed condition prior to issuing the removal notice,

though Plaintiff asserts that Heckler should have known from his interactions with Rigel in late

March and early April when Rigel was working.

Rigel did not sign for or pick up the May 30, 2000, removal letter until June 13.  Upon

receipt of the May 30, 2000, letter, Rigel did not call Heckler to discuss it or anything else; Rigel

did not call and talk to Nicka to check the status of his FMLA request.

After Heckler changed Rigel's sick leave status to AWOL and initiated removal proceedings, Heckler believed that Nicka had the authority to change Rigel's removal code[5] and that Nicka could approve an FMLA application while disciplinary action was pending.

***The missing FMLA paperwork and subsequent denial of the FMLA leave request***

Despite Rigel's statement to Heckler that Rigel would submit the FMLA paperwork by May 18th, no such paperwork had been submitted by the end of May 2000.  Rigel did, however, take the Form WH-380 to his doctor's office on or before May 16, 2000.  On May 16, 2000, Dr. Lisa Tkatch completed the form, but due to a miscommunication between Rigel and the doctor's office, the form was not sent to the USPS.  On June 7, 2000, Rigel ran into the former office manager of his doctor's office, and upon her suggestion, he called the doctor's office to check the status of the paperwork.  When he learned that the FMLA form was still sitting at the doctor's office, Rigel went to the office, picked up the form, and sent it by certified mail to Nicka.

On June 8, 2000, the USPS received Rigel's WH-380 certification form.  Rigel's doctor indicated that Rigel suffered from a "category four" serious health condition – a chronic condition that requires periodic visits to a health care provider for treatments; that continues over a period of time; and that may be episodic in nature, rather than requiring continual absences. The doctor noted Rigel suffered from "depression which has occurred as a result of the recent

---

[5]  The Postal Service's computer system uses different codes to reflect an employee's status and other personnel matters.  For instance, there are different codes to reflect whether an individual's leave is classified as annual leave, sick leave, sick leave approved as FMLA leave, on the job injury, AWOL, non-duty/non-pay status pending removal, etc.

death of his partner." (R. 73.)  The doctor wrote: "presently incapacitated, unable to determine duration, but his is currently under treatment" and that a "referral made to counseling." (Id.)

Nicka believed the WH-380 to be incomplete and illegible in parts.  She sent Rigel a letter on June 9, 2000, advising him that the certification was incomplete.  She specifically noted three deficiencies: (1) that Rigel's treatment had not been defined; (2) that the dates of incapacity were not noted; and (3) that the health care provider's signature and title were illegible.  Nicka instructed Rigel to submit the corrected documentation within 15 days of his receipt of the letter and informed him that failure to provide the corrected documentation would result in a denial of this FMLA leave.  She also stated, "If you are in non-pay, non-duty type status pending discipline prior to receiving your corrected certification, your request for coverage under the Family Medical Leave Act will be denied at that time." (R. 83.)  Nicka sent this certified letter to Rigel's official address and to the post office box used when he sent the WH-380 to Nicka. Rigel did not pick up or sign for the copies of Nicka's June 9, 2000, letters until June 29, 2000.

Rigel responded in writing two days after he picked up the letters.  Rigel's July 1, 2000, response clarified the name and title of his doctor and included a copy of an appointment card that had Dr. Tkatch's contact information on it.  Although the response by Mr. Rigel noted that Ms. Nicka identified three distinct problems in the original certification, Rigel addressed only the legibility concern by typing up his doctor's answers that appeared on the original WH-380 form. (R. 85-86.)  The letter did not address Nicka's concerns regarding the form's completeness.  Specifically, the undefined treatment and unclear/unspecified dates of incapacity were not addressed, and no new or supplemental information from the doctor was provided.

In the July 1st letter, Rigel also indicated that he would personally deliver Nicka's letter

and the WH-380 to his doctor's office staff for review and action on July 3, 2000.  (R. 86.)

The date on which Nicka received Rigel's July 1, 2000, letter is in dispute.  Nicka claims she received this letter on July 7, 2000, and then wrote Rigel a letter dated July 8, 2000 concerning the continued inadequacy of the supplemental FMLA documentation.  However, the certified letter receipt signed by Nicka reflects the date of receipt as being July 24, and Rigel never received Nicka's July 8th response letter and disputes its existence.

In any event, the USPS never received a corrected WH-380 certification from Dr. Tkatch, and in July 2000, Rigel's FMLA request was denied.

### A brief note on "non-pay, non-duty" status

In her June 9, 2000 letter to Rigel, Nicka stated that if Rigel's status was non-duty/non-pay status,[6] she could not grant him FMLA leave.  Nicka testified at her deposition that she does not approve or disapprove leave itself; rather, she is authorized to determine whether the leave that an employee takes can also be designated as "FMLA leave."  If an employee is in a non-duty/non-pay status, for example in a suspension pending removal or military leave, then Nicka could not approve FMLA leave for that period of time.  If the non-duty/non-pay status was later removed, however, then it would be possible for Nicka to retroactively grant FMLA leave to the employee, assuming that the conditions of FMLA leave were met (e.g., proper certification).

So, contrary to Heckler's belief, Nicka would not change the non-duty/non-pay status herself if the status was based on a disciplinary action, such as "pending removal for a disciplinary action."  Nicka would, however, input the FMLA code and retroactively grant the

---

[6] Here, Nicka is referring to one of the many codes that can be placed in the USPS personnel computer to classify a person's absence.  See supra footnote 5.

FMLA request if Heckler removed Rigel's "non-duty/non-pay pending removal" designation.

*Rigel's actions following the receipt of the May 30, 2000, removal notice*

Rigel did not sign for or pick up Heckler's May 30, 2000, removal notice until June 13. In response to the notice, Rigel sent Heckler a letter on June 23, 2000, in which he stated that he had submitted his FMLA paperwork, requested that the AWOL designation be removed from the personnel records and the notice of removal be rescinded, and demanded back pay.  (R. 70.)

Heckler believed that he could rescind the removal notice, but personally would not do so until he was notified that the FMLA leave request had been approved.  At the time of Rigel's June 23rd letter, Nicka had not received a completed WH-380 form that addressed the deficiencies pointed out by Nicka in the original Form WH-380.

On July 6, 2000, Rigel wrote Heckler and informed him that he would return to work effective July 15, 2000, the date on which Rigel opined his 12 weeks FMLA leave would have expired.  As far as Rigel was concerned, the FMLA leave should have been approved because he had provided a typed version of the original responses to the WH-380 form and had given his doctor the WH-380 form for her to correct and to send in.

Heckler wrote Rigel back on July 7, 2000, stating that Rigel had been removed effective July 8, 2000, and was, therefore, not authorized to return to work.

*Arbitration, subsequent problems, and Rigel's return to work at the USPS*

Through his union, Rigel grieved his removal from the USPS.  The arbitrator issued his decision and award on April 8, 2002.  The arbitrator held that since progressive discipline should have been – but was not – applied prior to Rigel's removal and since Rigel was not given a pre-disciplinary interview, the removal was improper.  The arbitrator also held that Rigel had not been timely in providing documentation to the USPS and that Rigel must bear some

15

responsibility for this.  The arbitrator held that Rigel's absence from April 14, 2000, through

November 20, 2000, was long-term disciplinary suspension without pay, but that Rigel should be

returned to employment effective May 7, 2002, with back pay and benefits awarded for the

period between November 20, 2000 and May 7, 2000, to make Rigel "whole."

A dispute arose between Rigel and USPS regarding the calculation of the back pay

benefits.  Under the Postal Service's policies, set forth in part in the Employee Labor and

Relations Manual, or ELM, an employee who challenges his termination must seek outside

employment to mitigate any back pay award if he is successful at the administrative level.

Where a back pay award exceeds six months, the employee is required to furnish documentation

of his efforts to obtain outside employment.  Clifton Wilks, a labor relations specialist for the

USPS, calculated Rigel's back pay following the arbitrator's decision.  After evaluating the

information provided by Rigel, Wilks determined that Rigel had failed to make a reasonable

effort to find employment and limited the award to 45 days of back pay consistent with the terms

of the ELM.

Also after the arbitration, a dispute arose as to Rigel's health benefits, specifically his

eligibility for temporary continuation of care benefits (TCC), the equivalent of COBRA benefits

under the Federal Employees Health Benefits Program (FEHBP).  Kathleen McDermott,[7] a

Human Relations Specialist, told Rigel that he was not entitled to TCC benefits because he had

---

[7]  Other than the Postmaster General, McDermott is the only remaining individual
defendant in Rigel's FMLA claim.  She is named in her official and individual capacity.  In her
position as a Postal Service Human Relations specialist, McDermott deals primarily with
employee benefits.  She did not supervise Rigel in any way, such as by controlling his work
duties, controlling his hours of employment, or approving his leave slips, etc.  She was not
involved in the denial of his FMLA leave request or in his removal from the Postal Service.

been on leave without pay for over 365 days while his grievance was pending.  Because this allegedly disqualified him from receiving TCC benefits, she would not call or write to the appropriate federal agency to have the benefits provided.  Rigel, however, suggests that McDermott improperly delayed his claim and that this is the reason why he could not get TCC benefits.  Since Rigel was unable to get the TCC coverage, he was without insurance starting mid-June 2001 and had to pay out-of-pocket for the medical expenses he incurred after that date.

Rigel filed a second grievance regarding the denial of his back pay and the failure to be reimbursed health benefits and expenses post mid-May 2001.  Prior to arbitration, the grievance was settled, with Rigel to be compensated for all back pay and benefits from January 3, 2001, through May 7, 2002.

When he returned to work on May 8, 2002, Mr. Rigel was ready to perform his job; however, about three days after his return, the USPS eliminated Rigel's position and gave his duties to an employee junior to him.  The USPS transferred Rigel to a different facility and gave him different duties.  Upon his return to work, Rigel's health care benefits were not put back into place and his employer "attempted to have [him] sign away the prior health care benefits awarded by the arbitrator."  (Doc. No. 62, ¶ 210.)  Current health care benefits were not reinstated until approximately March 2003.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986).  A factual dispute is material if it might affect

the outcome of the suit under the applicable law.  Anderson, 477 U.S. at 248.  A factual dispute

is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder

to return a verdict for the nonmoving party.  Id. at 249; Groman v. Township of Manalapan, 47

F.3d 628, 633 (3d Cir. 1995).  When deciding a motion for summary judgment, the Court views

the facts in the light most favorable to the nonmoving party, who is "entitled to every reasonable

inference that can be drawn from the record."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782,

788 (3d Cir. 2000).  "The inquiry is whether the evidence presents a sufficient disagreement to

require submission to the jury or whether it is so one sided that one party must, as a matter of

law, prevail over the other."  Anderson, 477 U.S. at 248.

The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694 (3d Cir.

1988).  Once the moving party has shown that there is an absence of evidence to support the

nonmoving party's claims, the nonmoving party may not simply sit back and rest on the

allegations in the complaint.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Instead, the

nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial."  Id.  Summary judgment should be granted where a party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case and on which that party will bear the burden at trial."  Id. at 322.

With respect to the sufficiency of the nonmoving party's evidence, a court should grant

summary judgment where the nonmovant's evidence is merely colorable, conclusory or

18

speculative.  <u>Anderson</u>, 477 U.S. at 249-50.  There must be more than a scintilla of evidence

supporting the nonmoving party and more than some metaphysical doubt as to the material facts.

<u>Id.</u> at 252; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

## III.    DISCUSSION

Defendants' argument on summary judgment is two-fold.  First, they address whether

Rigel has established an actual and actionable violation of the FMLA.  Specifically, they contend

that no FMLA violation occurred and that, even if a technical violation did occur, it was not

willful and is barred by the two-year statute of limitations for claims of non-willful violations

Second, if Rigel's FMLA claim survives summary judgment, Defendants contend that Defendant

McDermott should be dismissed since she is not Rigel's "employer" as defined by the FMLA.

In response to these arguments, Rigel explains that he has established an FMLA

violation; that, in fact, Defendants have continued to interfere with and retaliate against him for

exercising his FMLA rights well into the two-year period preceding his filing of this lawsuit; and

finally, that the three-year statute of limitations for willful FMLA violations applies to the denial

of his FMLA request and his termination.  He also asserts that McDermott may properly be held

liable under the FMLA.  Before reaching the merits of the alleged FMLA violation generally or

as to McDermott, the Court will address the nature of Rigel's claims and then determine whether

they were timely asserted.

### A.    Nature of Rigel's FMLA Claim

The twin purposes of the FMLA are to "balance the demands of the workplace with the

needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29

U.S.C. § 2601(b)(1), (2); <u>Conoshenti v. Pub. Serv. Elec. Gas Co.</u>, 364 F.3d 135, 140-41 (3d Cir.

2004).  The FMLA contains two distinct types of rights, which together seek to meet the needs of families and employees while accommodating the legitimate interests of employers.  E.g., Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 763 (5th Cir. 2001); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998); Campetti v. Career Educ. Corp., No. 02-CV-1349, 2003 WL 21961438, at *12-14 (E.D. Pa. 2004).  First, the statute provides a series of prescriptive or substantive rights, often referred to as the "entitlement" or "interference" provisions, which serve to "set[] substantive floors for conduct by employers, and creat[e] entitlements for employees."  Hodgens, 144 F.3d at 159 (internal quotation and citation omitted); accord Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  Primarily, the prescriptive provisions of the FMLA relate to a qualified employee's ability to take up to twelve weeks of unpaid leave and be returned to an equivalent position upon the expiration of that leave.  Callison, 430 F.3d at 119; see 29 U.S.C. §§ 2612-2614, 2615(a)(1).  The second type of rights contained in the FMLA are "proscriptive " rights.  Hodgens, 144 F.3d at 159-60.  These relate to the protection that is afforded to an employee in the event that he experiences discrimination or retaliation in response to the exercise of his prescriptive rights under the FMLA.  Id.; see 29 U.S.C. § 2615(a)(2), (b); Callison, 430 F.3d at 119.

The distinction between the types of rights and, therefore, the types of claims available under the FMLA is important in this case because the parties appear to dispute whether Rigel has asserted a violation of the FMLA's prescriptive provisions (by Defendants' denying his leave request and terminating him), its proscriptive provisions (through retaliation), or both.

The question of what type of FMLA claim Rigel has pleaded arose in an unique manner. In response to Defendants' argument that the statute of limitations had run on his FMLA claim,

Rigel responded that the "last event" from which to measure the statue of limitations is still unfolding, such that his FMLA claim is well within the limitations period.  (Doc. No. 61, at 24.) Rigel then provides a laundry list of events that "together show <u>discrimination</u> <u>against</u> [him] for his use of leave and opposing Postal Service's leave-related practices."[8]  (<u>Id.</u> at 25-26) (emphasis added).  In response to Rigel's argument that Defendants are liable under a proscriptive rights theory, Defendants argue that Rigel never asserted that type of FMLA claim; rather, Defendants contend that all Rigel's allegations of retaliation were related to his First Amendment and union activities claim which has been dismissed.[9]  (<u>See</u> Doc. No. 63, at 12-14.)

As an initial matter, the Court notes that nowhere in Rigel's complaint does he separate

_____

[8]  Rigel's non-exhaustive list of discriminatory actions by Defendants includes:
> (1) Deciding to terminate him while his FMLA claim was pending;
> (2) Actually terminating him while his FMLA claim was pending;
> (3) Terminating him for needing and taking medical leave; (4) Failing to allow him to use his accumulated sick leave or even any LWOP under the published Leave Policy; (5) Treating the back pay award as a back pay claim and refusing to pay him for over two (2) years after his return to work; (6) Interfering with the maintenance of his health insurance benefits while awaiting a hearing by refusing to cooperate in his TCC application; (7) Eliminating his position three (3) days after he returned to work; (8) Transferring him within days of returning to work; (9) Failing to send him PS form 3971 as mandated by Postal training; (10) Failing to reinstate his health care benefits for 10 months after he returned to work; (11) Failing to reinstate the past health care benefits under the Arbitrator's award; (12) Leaving him unable to submit medical reimbursement claims and thus leaving him uncompensated for his own out-of-pocket health care costs while his health benefits have been interminably delayed.

(Doc. No. 61, at 25-26.)  Rigel explains that the "series of events cited herein to interfere with and punish Mr. Rigel for needing, using, and taking medical leaves stands plainly as enough evidence for an employer or fact finder to conclude that the interference and <u>retaliation</u> were willful acts. . ."  (<u>Id.</u> at 26-27) (emphasis added).

[9]  The Court notes Rigel also asserted a claim for FLSA retaliation that was dismissed.

his claims, such as by labeling them "Count I" or "Count II," and Rigel has not identified which portion of his complaint asserts an FMLA retaliation claim.  Therefore, the Court is left to construe Rigel's FMLA claim from the context of the document as a whole.

The most obvious statement of Rigel's FMLA claim appears in paragraph 45 of the complaint, which states: "The Defendants violated Mr. Rigel's right to have access to and receive protected leave under the FMLA, either by disregarding the FMLA and its related Department of Labor regulations or by implementing procedures and policies that thwart the FMLA and its related regulations."  (Doc. No. 1, ¶ 45); (see id. ¶¶ 22-25) (setting forth the underlying facts of the claim, i.e., Plaintiff's FMLA request, denial, and removal).  As the Court understands this paragraph, Rigel is seeking relief for Defendants' allegedly wrongful termination and denial of his FMLA request, a violation of the substantive, or prescriptive, provisions of the FMLA.  He is not asserting that, as a consequence of making an FMLA request and pursuing his rights under the statute, Defendants proceeded to retaliate against him, a claim which would invoke the proscriptive provisions of the FMLA.[10]

---

[10]  The Court notes that this conclusion is bolstered by the fact that the parties' joint case management reports on February 2, 2004, and April 14, 2005, both note that the parties disputed:

> Whether plaintiff's FMLA claim is barred by the two-year statute of limitations in that plaintiff's claim accrued on July 8, 2000 (when his FMLA request was denied) but plaintiff did nor [sic] file his lawsuit until June 11, 2003.  See 29 U.S.C. §2617(c)(1). . . .
> Relatedly, whether plaintiff's FMLA claim is saved by the three-year statute of limitations governing willful violations of the FMLA, 29 U.S.C. §2617(c)(2), in that there is no evidence of an FMLA violation, let alone a willful one.

(Doc. No. 8, at 5-6; Doc. No. 23, at 4) (emphasis added).  The logical inference here is that both parties considered the date of Rigel's removal and denial of leave to be the date on which Rigel's FMLA claim accrued, at least as to his substantive FMLA claims – a date which would obviously not encompass subsequent acts of discrimination or retaliation.  (But see Doc. No. 61, at 26) (in the context of his retaliation and continuing violations argument, Plaintiff states that

The Court's consideration of Rigel's complaint will not end at this provision, however.

The complaint's preliminary statement provides, in relevant part, as follows:

> The United States Postal Service ("the USPS" or "the Postal Service") has retaliated against and punished Mr. Rigel for being a successful grievant, successful union advocate and successful part-time union worker, all in violation of his First Amendment rights to freedom of association. They willfully denied him the rights associated with federally protected leave, disregarded the statutory requirements in processing his requested leave and then discharged him for being on what should have been protected leave. The Postal Service continues to penalize him for successfully challenging their improper actions.

(Doc. No. 1, at 2.) And paragraphs 41 and 42 state:

> 41. A pattern of improper retaliatory conduct by the Postal Service and its supervisory personnel has emerged as evidenced by their repeated attempts to improperly remove this active union member from employment and their continual delays and denials of proper claims and applications for benefits. The Postal Service's overall actions have been designed and, in fact, have succeeded in improperly penalizing Mr. Rigel for his protected union activity, violating his First Amendment rights to freedom of association and related rights.

> 42. The postal service's pattern of retaliatory conduct evidences a willful contempt and disregard for the laws that provide rights to Mr. Rigel and other postal employees, including the denial of meaningful access to the rights protected by the Back Pay Act; the Fair Labor Standards Act; the Family and Medical Leave Act; the Federal Employees Health Benefits Program; the Labor Management Relations Act; and the Rehabilitation Act . . .

(Doc. No. 1, ¶¶ 41-42) (citations to and abbreviations of statutes omitted in paragraph 42).

These quoted passages appear to be exhaustive of Rigel's allegations of punishment and

retaliation while also mentioning the FMLA. (See id. ¶¶ 29, 30, 39, 47) (addressing retaliation

---

the termination date should not be the controlling date).

or punishment in the context of the First Amendment or the FLSA, without mentioning the

FMLA).  Several factors counsel against reading these passages as incorporating a claim for

retaliation under the FMLA.  First, at best, the language is vague in referencing a claim for

retaliation under the FMLA.  While it is true that Federal Rule of Civil Procedure 8 requires only

a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.

Civ. P. 8(a), notice pleading is not without its limits.  A complaint must give a defendant "fair

notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson,

355 U.S. 41, 47 (1957).  Second, these passages must be read in context.  In each of these

passages, the focus is upon Defendants' alleged retaliation for Rigel's First Amendment activity,

primarily his union activity and participation in the union's grievance process.  In this context,

and when compared with the plain statement of FMLA violations in paragraph 45, the mention

of the denial of FMLA rights in these passages seems only to highlight the seriousness of

Defendants' alleged misconduct with respect to Rigel's union activities, not to state a claim for

FMLA retaliation.  Thus, the Court agrees with Defendants that Rigel's assertions of retaliation

were all related to his First Amendment union activity or with his claim under the FLSA.  The

complaint would not have adequately placed Defendants on notice that violations of the FMLA's

anti-discrimination and retaliation provisions had been alleged.

To the extent that Rigel is somehow seeking to invoke a continuing violations theory

without asserting a retaliation claim, that, too, must fail.  The Supreme Court has made clear that

a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"  National

R.R. Passenger Corp. v. Morgan, 532 U.S. 101, 110 (2002) (Title VII case).  Discrete acts are

viewed as separately actionable claims, with "[e]ach discrete discriminatory act start[ing] a new

clock for filing charges alleging that act." Id. at 113.  Commonly cited examples of discrete acts include termination, failure to promote, denial of transfer, or refusal to hire.  Id. at 114.  Here, the discrete acts were the alleged wrongful denial of Rigel's leave request in July 2000 and his resulting  termination.  The subsequent acts of alleged retaliation following Rigel's successful union grievance – for example, the dispute over temporary continuation of coverage (TCC) benefits in 2001, the back pay dispute in September 2002, the transfer from the Federal Square Post office to another facility in 2002 – do not relate back to make the initial denial of benefits, removal, and later events a "continuing violation" of the FMLA's substantive provisions.  See Rush v. Scotts Specialty Gases, Inc., 113 F.3d 476, 481-82 (3d Cir. 1997) (discussing discrete and isolated events of discrimination and setting forth the factors considered in determining whether a plaintiff has demonstrated a continuing violation).  Instead, they are discrete, separately actionable claims: the claim for the removal and wrongful denial of benefits are claims under the FMLA's prescriptive rights provisions, and the subsequent alleged misconduct would have been claims asserted under the FMLA's anti-discrimination and retaliation provisions.

In sum, Rigel has not pleaded an FMLA claim with respect to the alleged acts of discrimination and retaliation occurring after the denial of his FMLA request and termination, nor are these acts appropriately considered under a continuing violations-type theory.

**B.**     **Timeliness of Rigel's FMLA claim**

Having determined that Rigel has not stated an FMLA claim for retaliation, the Court

turns to the claim that Rigel has pleaded – the wrongful denial of leave and termination[11] – to

determine whether it is an actionable.  With respect to prescriptive rights, 29 U.S.C. § 2612(a)(1)

provides that "an eligible employee shall be entitled to a total of 12 work weeks leave during any

12-month period . . . because of a serious health condition that makes the employee unable to

perform the functions of the position of such employee."  It is the plaintiff's burden to

demonstrate that he was entitled to benefit under the FMLA, but was denied that benefit.  Bearly

v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 570-71 (M.D. Pa. 2004).

### 1.      *FMLA limitations periods and "willful" violations*

To assert a timely FMLA claim, a plaintiff generally must file suit "not later than 2 years

after the date of the last event constituting the alleged violation for which the action is brought."

29 U.S.C. § 2617(c)(1).  The statute of limitations period is extended to three years if the

violation was willful.  29 U.S.C. § 2617(c)(2).  Here, Rigel was informed on May 30, 2000, that

he would be removed effective July 8, 2000, and his leave request was likewise denied at some

point in July 2000.  While Rigel's claim accrued in July 2000, he did not file suit until June 11,

2003, well beyond the standard two-year statute of limitations period.  Accordingly, Rigel will

only be allowed to proceed with his FMLA claim if he can establish that it should fall within the

---

[11]   While some cases have considered termination claims under the rubric of the FMLA's
anti-retaliation and discrimination provisions, the Third Circuit has opined that a claim that an
employee has been discharged in retaliation for having taken FMLA leave is predicated upon 29
C.F.R. § 825.220(c), and "does not come within the literal scope of the sections of the FMLA
directed to retaliation."  Section 825.220(c), provides, in relevant part, that "an employer is
prohibited from discriminating employees . . . who have used FMLA leave," and "employers
cannot use FMLA leave as a negative factor in employment actions, such as hiring, promotions,
or disciplinary actions. . ."  See Conoshenti, 364 F.3d at 146-47 n.9  Therefore, the Court
construes Rigel's discharge as being part of his claim that Defendants violated the substantive
provisions of the FMLA when they interfered with his "right to have access and to receive
protected leave."  (Doc. No. 1, ¶ 45.)

26

three-year statute of limitations for willful violations.  The question therefore becomes whether Rigel has introduced sufficient evidence from which a fact-finder could conclude that the denial of his FMLA leave and his termination were willful violations of the FMLA.

The FMLA does not define "willful," and neither the Supreme Court nor the Third Circuit has expressly defined it in the context of the FMLA.  Both, however, have addressed "willfulness" in the context of the FLSA, Brock v. Richland Shoe Co., 799 F.2d 80 (3d Cir. 1986), aff'd sub nom. McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), and the standard articulated in by the Supreme Court in McLaughlin has been utilized by other courts in the FMLA context.  E.g. Hanger v. Lake County, 390 F.3d 579, 583-84 (8th Cir. 2004).  A plaintiff attempting to establish a willful violation of the FMLA must do more than show that his "employer knew [the FMLA] was in the picture," because such a low standard would "obliterate any distinction between willful and nonwillful violations."  McLaughlin, 486 U.S. at 130, 132-33.  The Court specifically rejected a standard for willfulness that "would . . . permit a finding of willfulness to be based on nothing more than negligence, or, perhaps on a completely good-faith but incorrect assumption" that the employer was complying with the law in all respects.  Id. at 135.  Instead, a "willful" violation requires a showing that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."  Id. at 133.

### 2. *Regulations related to making and processing an FMLA leave request*

An employer's understanding of the FMLA and its related regulations are important in discerning whether it "knew or showed reckless disregard" for whether it was violating the statute.  Accordingly, the Court will address briefly the regulations related to making and processing an FMLA leave request before turning to the facts of Rigel's request and termination.

When requesting foreseeable FMLA leave, an employee need not invoke the FMLA expressly, but he must give the employer notice "sufficient to make the employer aware that the employee needs FMLA-qualifying leave."  29 C.F.R. § 825.302(c); see also 29 C.F.R. § 825.208(a)(2) (noting that an employee need not specifically invoke the FMLA to meet the notice requirement, "though the employee would need to state a qualifying reason for the needed leave").  When requesting unforeseeable FMLA leave, the employee is generally expected to give notice to the employer "within no more than one or two working days of learning of the need for leave, except in such extraordinary circumstances where such notice is not feasible."  29 C.F.R. § 825.303(a).  Although not explicitly stated in 29 C.F.R. § 825.303, the notice requirement for unforeseeable leave would likewise need to alert the employer that the leave is being taken for a reason potentially within the scope of the FMLA.  Once an employee informs the employer that leave is needed, "[t]he employer will be expected to obtain any additional required information through informal means," and the employee is expected to furnish this information as soon as practicable.  29 U.S.C. § 825.303(b).

An employer may require that an employee's request for leave be supported by a certification issued by the health care provider, a copy of which the employee must provide, in a timely manner, to the employer.  29 U.S.C. § 2613(a).  The information that must be included for a certification to be sufficient is addressed in 29 U.S.C. § 2613(b),[12] and the Department of

_____

[12]  A medical certification is sufficient if it is signed by a qualified health care provider and states:
> (1) the date on which the serious health condition commenced;
> (2) the probable duration of the condition;
> (3) the appropriate medical facts within the knowledge of the health

Labor has developed an optional form, revised form WH-380, for employees to use in obtaining

medical certification.  29 C.F.R. § 825.306(a).  "This optional form reflects certification

requirements so as to permit the health care provider to furnish appropriate medical information

within his or her knowledge."  29 C.F.R. § 825.306(a).

When the employer requests the certification, it generally must allow the employee at

least 15 calendar days to respond and advise the employee of the consequences of the failure to

provide the adequate certification.  See 29 C.F.R. § 825.305(b), (d).  The employee must provide

the certification within the time frame requested by the employer, although an employee's

untimely certification will suffice when "it is not practicable under the particular circumstances

to [return it by the deadline] despite the employee's diligent, good faith efforts."  29 C.F.R.

§ 825.305(b).  If the employer finds the certification to be incomplete, the employer must notify

the employee and "provide the employee a reasonable opportunity to cure any such deficiency."

29 C.F.R. § 825.305(d).  Once the employer receives a completed Form WH-380, or another

---

care provider regarding the condition; . . .
(4)(B) for purposes of leave under section 2612(a)(1)(D) of this title,
a statement that the employee is unable to perform the functions of
the position of the employee;
(5) in the case of certification for intermittent leave, or leave on a
reduced leave schedule, for planned medical treatment, the dates on
which such treatment is expected to be given and the duration of such
treatment;
(6) in the case of certification for intermittent leave, or leave on a
reduced leave schedule, under section 2612(a)(1)(D) of this title, a
statement of the medical necessity for the intermittent leave or leave
on a reduced leave schedule, and the expected duration of the
intermittent leave or reduced leave schedule . . .
29 U.S.C. § 2613(b); see also (Doc. No. 61-2, App. at 32) (this is the section of the Postal
Service's FMLA "Training for Supervisors" manual which addresses the information that a
certification must have in order to be complete).

form containing the same basic information, no additional information may be required from the employee.  29 C.F.R. § 825.306(b).

### 3. *Application to the facts in Rigel's case*

The facts of this case, set forth in great detail above, reveal that Rigel's FMLA leave request was plagued with difficulties.  Most obviously, there is the haphazard way in which the Postal Service and Rigel communicated, which was exacerbated by the fact that Rigel did not regularly check his mail even though he knew that it was the only way the Postal Service management would contact him directly.  There is the fact that Rigel did not notify the Postal Service that he wished to take FMLA leave until May 16, 2000, six days after Heckler changed the period of Rigel's unexplained absence from "sick" to "AWOL."  Then there is the apparent lack of communication between Heckler and Nicka as to Nicka's authority to override the "non-duty/non-pay" code in the personnel computer to enter a code for "FMLA-approved sick leave."  There is also the fact that Rigel did not ensure (1) that his medical certification was received by his employer by the May 18, 2000, deadline he provided or (2) that Nicka's concerns regarding the initial WH-380 were adequately addressed by his doctor in a timely manner.  Given the unconventional and somewhat bungled handling of the FMLA leave request on both sides, it is easy to see how Rigel, suffering from a severe depression, did not receive the FMLA-approved leave to which he felt entitled and for which he likely would have qualified had the request been timely made and the appropriate paperwork timely received and processed.

To avail himself of the three-year statute of limitations for FMLA claims, however, a plaintiff show more than that his claim was "bungled."  Rigel must establish that the USPS knew it was violating the FMLA or acted with reckless disregard for whether its conduct violated the

FMLA.  McLaughlin, 486 U.S. at 133.  For the reasons discussed below, Rigel has not

demonstrated sufficient evidence to create a genuine issue of material fact on the question of

willfullness.[13]

As discussed above, there was a chain of specific events leading to Heckler's decision to

classify Rigel as AWOL and seek Rigel's removal and leading to Nicka's denial of Rigel's

FMLA application.  This chain of events included: (1) Heckler's April 24, 2000, absence inquiry

letter and May 5, 2000, pre-disciplinary interview letter; (2) Heckler's decision to change Rigel's

status to AWOL on May 10, 2000, when Rigel did not respond by the May 1, 2000, deadline in

the absence inquiry letter; (3) Rigel's untimely May 16, 2000, response to both letters informing

Heckler that he was seeking FMLA leave; (4) Rigel's failure to submit his FMLA paperwork to

Nicka by May 18th, the deadline Rigel himself provided; (5) Heckler's initiation of removal

proceedings at the end of May when no FMLA paperwork had been submitted; (6) Rigel's

untimely submission of the WH-380 to Nicka on June 8, 2000; and (7) Rigel's failure to address

all of the perceived deficiencies noted by Nicka in the original WH-380.

In an effort to show a willful violation, Rigel argues that Heckler personally did not like

Rigel, referring to the 1998 disciplinary action and other workplace disagreements.  Rigel does

not point to evidence on the record supporting the assertion that Heckler was motivated by any

perceived animus or desire to thwart Rigel's FMLA request; rather, there is evidence that

Heckler was seeking to act consistently with the FMLA.  His absence inquiry letter notified

---

[13]  Because the Court concludes that Rigel's FMLA claim is barred by the FMLA's
standard two-year statute of limitations, the Court need not determine whether an FMLA
violation actually occurred.  Nor must the Court reach the issue of whether McDermott is an
"employer" under the FMLA.

Rigel of his rights under the FMLA and provided him with the WH-380 form in case the FMLA applied. Heckler did not immediately commence removal proceedings when he learned the FMLA may be involved; rather, he waited until a week after Rigel promised to get the paperwork in before proceeding with disciplinary action.

Rigel also argues that Heckler knew from the very beginning of his absence that Rigel was suffering from depression and should have proceeded accordingly. Rigel points to the fact that Heckler was aware Rigel had been out in March on bereavement leave. It does not necessarily follow, however, that because an employee's loved one passes away that the employee will fall into a debilitating depression and be unable to function in any meaningful way. Rigel's assertion is also undercut by the fact that Rigel returned to work at the end of March and was apparently able to perform his duties without incident until he called off April 14, 2000. Rigel contends that Heckler's inclusion of the FMLA paperwork with his absence inquiry letter indicates that "Heckler knew or suspected the seriousness of Mr. Rigel's illness," (Doc. No. 61, at 4), but it is undisputed that the absence inquiry letter was a standard form letter recommended by the Postal Service's Labor Relations when faced with an employee's unexplained absence (R. 274, 277, Lister Dep. 79-80, 91-92).

Rigel makes much of the USPS's alleged failure to follow its own internal protocol for handling FMLA claims. Specifically, he notes that Nicka never made any effort to provisionally protect his leave, a procedure set forth in the FMLA "Supervisor's Training Manual." (Doc. No. 61-2, App. at 33.) Rigel neglects to mention, however, that his sick leave had already been converted to AWOL by the time Nicka learned that Rigel was absent and would be seeking FMLA leave. He also points to the USPS's leave without pay (LWOP) policy and argues that

the USPS's failure to grant him such leave as evidence of their willful and intentional efforts to deprive him of his FMLA rights.  Rigel correctly asserts that, under the ELM, an employee generally will not be separated from employment because of injury or illness lasting less than one year (Doc. No. 61-2, App. at 66), but he fails to acknowledge that LWOP for personal illness may be approved only after proper medical documentation is provided (Id.).  See also supra footnote 4.  Such documentation was never provided in this case.

Turning to the documentation that was provided, Rigel vehemently argues that the information that he provided in the original certification met the statutory requirements as set forth in 29 U.S.C. § 2613.  He further contends that Form WH-380 demands more than the statute itself and argues that Nicka's request that the form be completed (with special attention paid to the stated problems) was improper and goes to establish a willful violation.  However, the WH-380 is a form created and recommended by the Department of Labor, and there is language in the Code of Federal Regulations indicating that the form reflects the certification requirements, 29 C.F.R. § 825.306(a).  Thus, it does not seem unreasonable or an effort to flout the law by Nicka for her to insist that the form be completely filled out.  Although Rigel's doctor filled in some of the WH-380 certification form, she did not clearly complete all of the sub-parts of questions 5 and 6, and she did not answer any part of question 7; it was not unreasonable for Nicka to ask that these matters be addressed.  While Rigel's retyping of the form cured the legibility issue, it did not – and could not – provide the answers to these questions.  With respect to the certification Rigel also argues, without citing to authority, that proper completion of the form was the doctor's responsibility, not his.  The Court is unpersuaded by this argument, which overlooks the fact that the burden is on Rigel to provide a completed WH-380 (or other

document signed by a doctor setting forth the information addressed in 29 U.S.C. § 2613).  See

29 U.S.C. § 2614(a), 29 C.F.R. § 825.305.

Finally, there are Rigel's arguments that he was not afforded an adequate amount of time

to get the doctor's certification and that he did, in fact, try to comply with his employer's

demands in a diligent and prompt manner.  It is undisputed that when she concluded that the

original WH-380 was incomplete, Nicka immediately sent Rigel a letter on June 9, 2000,

informing him of this fact, identifying the perceived deficiencies, and notifying him that the

failure to provide the cured certification within 15 days would result in denial of the FMLA

request.  These steps conform with the requirements as set forth in the Code of Federal

Regulations discussed above.  See 29 C.F.R. § 825.305.  Although the Court recognizes that

Rigel suffered though an incredibly difficult time, Defendants do not bear the responsibility for

his failure to check his mail or follow up more diligently with his FMLA paperwork.  In light of

case law upholding the denial of FMLA leave and/or other disciplinary measures when an

employee fails to timely submit FMLA paperwork, the Court cannot say that Defendants acted

unreasonably by proceeding with disciplinary action when several of their deadlines had passed

without response from Rigel.  See Washington v. Fort James Operating Co., 110 F. Supp. 2d

1325, 1331-32 (D. Or. 2000) (rejecting plaintiff's contention that an employer may never deny

FMLA leave as long as the employee ultimately presents it with a proper certification and

holding that "an employer may deny FMLA leave where the employee has failed to timely

submit the required certification unless timely submission was not reasonably possible under the

employee's particular facts and circumstance").  For instance, the Seventh Circuit in Muhammad

v. Indiana Bell Telephone Co., Inc., 182 F. App'x 551 (7th Cir. 2006), affirmed the district

court's summary judgment for the employer, stating:

> As required under the regulations, Indiana Bell provided written
> notice, gave Muhammad 15 days to respond, and warned her of the
> consequences of not complying.  Because Muhammad did not
> respond, Indiana Bell reasonably could conclude that her absences
> were unexcused and that it could take disciplinary action, including
> terminating her.
> * * *
> Indiana Bell was entitled to require Muhammad to obtain within 15
> days the doctor's assessment of how often she would be
> incapacitated, and until when.  When she did not, Indiana Bell
> properly found the absences not covered.

Muhammad, 182 F. App'x at 553-54 (internal citations omitted).  More recently, the Northern

District of Oklahoma stated:

> [C]ase law holding the denial of FMLA leave is appropriate, in some
> circumstances, based on a missed deadline for certification is
> sufficient for the Court to concluded that Defendant did not know its
> conduct in failing to accept the [untimely certification] violated the
> law or acted with reckless disregard as to whether its conduct
> violated the law.  Instead, Defendant was adhering to a deadline it set
> for compliance.

Bass v. Potter, No. 05-CV-220, 2006 WL 1666183, at *6 (N.D. Okla. June 7, 2006).  In Bass, the

employee did, in fact, submit a corrected certification, but not until after the employer's deadline

had passed.  Id. at *5.  There, the court concluded that, while adherence to the deadline may have

been overly rigid, it did not establish a willful violation.  Id.  Here, Rigel never submitted a

certification perceived by USPS to be complete.

In short, Rigel has not created a genuine issue of material fact as to whether Defendants –

either in imposing certain absenteeism and FMLA deadlines or taking disciplinary action when

the deadlines were not met – knew or showed reckless disregard for the matter of whether their

conduct was prohibited by the FMLA.  Assuming that there was an FMLA violation, Rigel has at

best shown that his employer was either negligent in handling the FMLA leave request and

removal proceedings or incorrect in its belief that it was complying with the mandates of the law.

From the perspective of USPS, initiating disciplinary measures is not an unreasonable response

when faced with an employee who called off sick and then failed to return to work or offer any

kind of explanation for the absence until more than a month later, after being classified as

AWOL.  When Rigel failed to deliver the FMLA documentation by a week after the deadline he

himself provided, the USPS commenced removal proceedings.  Rigel's FMLA documentation,

received three weeks after promised, was perceived to be incomplete, and no cured certification

from his doctor was submitted before his removal date.  From the Heckler's point of view, it

made little sense to rescind the removal notice unless and until FMLA leave was approved,[14]

which it never was.

   Under these circumstances, the Court concludes that Defendants' actions were reasonable

attempts to comply with the FMLA.  Even assuming Defendants' conduct was unreasonable or

in fact violated the FMLA, there is simply insufficient evidence on the record to conclude that

the denial and removal were willful violations of the FMLA, entitling Rigel to the three-year

---

[14]  There appears to be a factual dispute concerning whether Nicka could change the non-duty/non-pay code on the computer to give someone FMLA-approved leave.  Nicka testified that she was not authorized to remove disciplinary codes to grant FMLA, but Heckler indicated that she was the final say regarding FMLA leave request.  (Doc. No. 61, at 8).  This factual dispute, however, does not preclude summary judgment.  The issue at this juncture is not whether a violation of the FMLA occurred; rather, the focus is on the USPS's understanding of the law and FMLA approval process and whether its actions were "willful."  Regardless of whether Heckler or Nicka is correct about Nicka's ability to change the codes, Rigel has not shown that they held unreasonable beliefs that were in reckless disregard of his rights under the FMLA or that they were part of some concerted and intentional effort to thwart Rigel's FMLA request.

   Likewise, the factual dispute regarding the date Nicka received Rigel's July 1, 2000, letter and her response to the same does not preclude summary judgment.

statute of limitations.

Accordingly, Defendants' motion for summary judgment will be granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARC RIGEL,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:03-CV-971** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| | : | |
| **CLIFTON D. WILKS, Individually and** | : | |
| **as Labor Relations Specialist for the** | : | |
| **United States Postal Service;** | : | |
| **JONATHAN LISTER, Individually and** | : | |
| **as Labor Relations Specialist for the** | : | |
| **United States Postal Service;** | : | |
| **BARBARA J. NICKA, Individually and** | : | |
| **as Acting Manager of Attendance** | : | |
| **Control and Family Medical Leave** | : | |
| **Administrator for the United States** | : | |
| **Postal Service; KATHLEEN** | : | |
| **MCDERMOTT, Individually and as** | : | |
| **Human Resource Specialist for the** | : | |
| **United States Postal Service; JOHN E.** | : | |
| **POTTER, Postmaster General of the** | : | |
| **United States Postal Service; and the** | : | |
| **UNITED STATES POSTAL SERVICE;** | : | |
| **Defendants** | : | |

**<u>ORDER</u>**

**AND NOW**, this 28th day of December, 2006, upon consideration of Defendants'

Motion for Summary Judgment (Doc. No. 45), filed in the above-captioned matter, and for the

reasons set forth in this Court's Memorandum Opinion filed herewith, **IT IS HEREBY**

**ORDERED** that Defendants' motion is **GRANTED**.  Plaintiff's FMLA claim is **DISMISSED**

as being time-barred by the applicable two-year statute of limitations.  All other motions pending

before the Court are hereby **DENIED** as moot.

The Clerk of Court is directed to enter judgment in favor of Defendants and to close the file.

 s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania